

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>FOPCO, INC.<br><br>                Debtor. | Case No. 18-01084<br>Chapter 7 |
| RICHARD A. YANAGI, Chapter 7<br>Trustee,<br><br>                Plaintiff,<br><br>    vs.<br><br>DENNIS C. McELRATH; 2149<br>LAUWILIWILI LLC; and CD<br>INVESTMENTS LIMITED<br>PARTNERSHIP,<br><br>                Defendants. | Adv. Pro. No.: 20-90014 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this adversary proceeding was held on September 12-15 and November 15, 2024. Michael Okazaki and Alison Ito represented plaintiff Richard A. Yanagi, as bankruptcy trustee of FOPCO, Inc., Richard E. Wilson and James N. Duca represented plaintiff Nan, Inc.,[1] and Jordan Blask, Sloane O'Donnell, and Johnathan Bolton represented defendants Dennis McElrath, 2149 Lauwiliwili LLC, and CD Investments Limited Partnership. Post-trial briefing concluded on February 7, 2024.

Based on the evidence and the clear and convincing standard of proof, the court makes the following

## FINDINGS OF FACT

### A. THE DEFENDANTS

From 1989 (or earlier) until about 2018, FOPCO, Inc. ("FOPCO") was engaged in business as a building contractor. At all relevant times, defendant Dennis C. McElrath was its sole officer, responsible managing employee, and (except for a brief period described below) sole shareholder.

---

[1] The bankruptcy trustee initiated the case. Later, with court approval, the trustee sold 95% of the claims to Nan, Inc. Therefore, the trustee and Nan are now co-plaintiffs.

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 2 of 45

From at least 2010 until the present, Mr. McElrath owned or controlled (or both) Defendants CD Investments Limited Partnership ("CDI") and 2149 Lauwiliwili LLC ("2149"). FOPCO leased real estate from 2149 and equipment from CDI.

## B. THE CONTRACTUAL RELATIONSHIP BETWEEN NAN AND FOPCO

In 2009, the United States Naval Facilities Division ("NAVFAC") solicited bids from small contractors as part of a $200,000,000.00 Design-Build/Design-Bid-Build HubZone Multiple Award Construction Contract ("MACC"). Under the MACC, NAVFAC established a short list of prequalified contractors who could bid on individual jobs, called task orders.

NAVFAC gave certain preferences under the MACC to contractors certified by the United States Small Business Administration as "HUBZone contractors." At the time, both FOPCO and Nan operated as building contractors, FOPCO was certified as a HUBZone contractor, and Nan was not.

Before NAVFAC decided which contractors would be prequalified under the MACC, FOPCO and Nan entered into a Teaming Agreement,

3

dated August 3, 2010. The Teaming Agreement provides that, if NAVFAC awarded a prime contract to FOPCO, Nan would "perform [FOPCO's] scope of work under the Prime Contract," "assume all duties, obligations, and responsibilities" of FOPCO under the prime contract and related agreements between FOPCO and NAVFAC, and "obtain, pay for, furnish, and provide all labor, services, materials . . . and other facilities of every kind and description required for the prompt and efficient performance of all of the Work . . . ." Nan also agreed to provide all bonding required by NAVFAC. Thus, the Teaming Agreement shifted to Nan essentially all of FOPCO's obligations under any prime contract with NAVFAC.

After NAVFAC qualified FOPCO to bid for task orders under the MACC, Nan and FOPCO entered into two more agreements. These agreements "further defined" the parties' relationship but did not supersede the Teaming Agreement.

The first such agreement, entitled "Agreement" and referred to as the "Profit and Coefficient Agreement", includes several relevant provisions. (1) The parties agreed to enter into a master subcontract agreement

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed 03/06/24   Page 4 of 45

applicable to all awarded task orders. (2) The parties agreed to split any profits on each completed task order, with forty percent payable to FOPCO and sixty percent to Nan. (3) If the parties realized a loss on any task order, the loss would be offset against and recoverable from the profits on any other "open and on-going" task order, but not against profits from any completed task order, and Nan would bear any remaining losses. (4) All estimates and bids submitted to NAVFAC and "all material decisions necessary of execution of each Task Order" would be made by mutual agreement. But if the parties could not agree, Nan had the final say based on Nan's view of what was "in the best interest of the teaming arrangement." (5) Each party was entitled to a "coefficient" to cover overhead and similar costs. FOPCO's coefficient was 1% of each payment and Nan's was 2.5%. (6) FOPCO had the option to "bid, bond, and self-perform" specific task orders, in which case Nan would not share any profits or bear any losses.

The second agreement is entitled "Subcontractor Agreement" and referred to as the "Master Subcontract." The Master Subcontract states that it "shall apply to all Task Orders under the Prime Contract excluding those

5

Task Orders that are bid, bonded and performed by [FOPCO] independently." Although the Master Subcontract is in the form that Nan typically used for firm, fixed-price subcontracts, the spaces in the form for the price and description of work are blank.

Taken together, the three agreements created a relationship that was similar to a joint venture in many respects: the parties agreed to work together to develop the bids to NAVFAC and to carry out the work, with Nan having the final say if the parties could not agree; and they agreed on an allocation of profits and losses. The arrangement is also different from the typical prime contractor/subcontractor relationship. Usually, the prime contractor controls the subcontractor's work, while the Teaming Agreement and Profit and Coefficient Agreement gave the "subcontractor" Nan the final say on many important matters. Further, unlike a typical construction subcontract, the Master Subcontract did not specify a firm, fixed price for any work under any task order.

FOPCO and Nan worked together on thirty-two task orders.[2]  As to

_____

[2] FOPCO self-performed nine task orders without Nan's involvement.

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 6 of 45

seventeen of those task orders, FOPCO and Nan completed the work, NAVFAC paid what it owed, and FOPCO and Nan resolved the division of the costs and profits. As to the remaining fifteen task orders, the parties completed the work and NAVFAC paid FOPCO the full contract price, but Nan and FOPCO never agreed on the division of the proceeds and FOPCO never paid the full amount that Nan claims.

FOPCO and Nan worked together smoothly for the first few years. Around 2013, FOPCO began to dispute many of Nan's billings. Nan agreed with some of FOPCO's claims; in particular, Nan acknowledged that it had improperly added State of Hawaii general excise tax to some of its billings, and it gave Nan a corresponding credit. Nan did not agree, however, with most of FOPCO's concerns. The relationship became increasingly contentious. FOPCO's payments to Nan slowed and eventually stopped entirely.

### C. THE 1/15/2015 TRANSFER

Mr. McElrath entered into a Share Exchange Agreement, dated as of November 21, 2014, with Equal Earth, Inc. ("EE"). Later, Mr. McElrath and

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 7 of 45

EE amended the agreement (the "EE Agreement").

Pursuant to the EE Agreement, EE acquired all 8,000 shares of FOPCO's stock from Mr. McElrath in exchange for 6,700,000 shares of EE's stock. The EE Agreement recited that EE's stock was worth $1.50 per share, or a total of $10.05 million.

The EE Agreement provided that, if EE did not "undergo its Initial Public Offering or other Liquidity Event" ("IPO") by December 31, 2015, Mr. McElrath had the option to unwind the transaction and recover his stock in FOPCO for no payment, and EE would reimburse Mr. McElrath for expenses reasonably incurred in the unwinding.

The EE Agreement provided that Mr. McElrath would continue to control the day-to-day operations of FOPCO and serve as its sole officer until EE completed its IPO.

EE agreed that FOPCO should distribute to Mr. McElrath cash in an amount equal to his equity in the company. But EE wanted to close the stock exchange transaction before the end of 2014 and defer the equity distribution to Mr. McElrath until after the end of 2014. EE wanted this arrangement so

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 8 of 45

FOPCO's financial position, and therefore EE's financial position as FOPCO's owner, would appear better on EE's financial statements as of December 31, 2014. Therefore, the EE Agreement provided that Mr. McElrath would receive "[EE's] non interest bearing Promissory Note in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00), payable from [FOPCO] no later than January 5, 2015." Pursuant to this provision, FOPCO executed a promissory note in favor of Mr. McElrath in the amount of $1.5 million.

The amount of the $1.5 million promissory note was equal to FOPCO's projected equity as of December 31, 2014, as calculated by FOPCO's and Mr. McElrath's accountant. Mr. McElrath believed that it represented the reasonable value of his remaining equity in FOPCO. In other words, payment of the note was intended to reduce FOPCO's net worth to zero and to reduce its cash balance substantially.

In short, the promissory note did not represent a preexisting debt that FOPCO owed to Mr. McElrath; rather, it evidenced FOPCO's promise to cash out Mr. McElrath's equity in the company on a deferred basis. It evidenced a

9

deferred shareholder distribution, not a true debt.

On or about January 15, 2015, FOPCO paid Mr. McElrath $1.5 million (the "1/15/2015 Transfer").

### 1. No Reasonably Equivalent Value

FOPCO received nothing of value in exchange for the 1/15/2015 Transfer. That transfer was in substance a distribution to Mr. McElrath on account of his shareholder interest in the company. The transfer did not benefit FOPCO in any way.

### 2. FOPCO's Intent When It Made The 1/15/2015 Transfer

The plaintiffs proved, by clear and convincing evidence, that FOPCO made the 1/15/2015 Transfer with the actual intent to hinder, delay, or defraud Nan, a current and future creditor.

Mr. McElrath denied harboring any such intent. He testified that he believed, based in part on the advice of his financial advisers, that FOPCO would be able to carry on its business and pay its debts in the ordinary course after the 1/15/2015 Transfer. His testimony is not credible. Mr. McElrath must have known that FOPCO could not survive if all or most of

U.S. Bankruptcy Court - Hawaii  #20-90014  Dkt # 288  Filed  03/06/24  Page 10 of 45

Nan's claims were valid. As an experienced businessperson in the construction industry, he must have known that, even though he disputed most of Nan's billings, there was a significant risk that Nan's claims would be sustained. In that event, Nan would have been entitled to most or all of FOPCO's assets, and he would have received nothing. He decided to take as much cash as possible out of FOPCO for his own benefit, rather than run the risk that Nan might get that cash instead.

### 3. FOPCO's Insolvency on January 15, 2015

On January 15, 2015, the sum of FOPCO's debts exceeded its assets, at a fair valuation.

According to the balance sheet attached to FOPCO's tax return for the calendar year ending on December 31, 2014 (the "12/31/2014 Balance Sheet"), FOPCO's assets amounted to $4,932,417 and its liabilities were $3,649,518. The 12/31/2014 Balance Sheet was accurate in all material respects except that it did not reflect the fact that FOPCO had promised to make an equity distribution of $1.5 million to Mr. McElrath a short time later. Although this was not a true debt, FOPCO knew and intended that it would make that

11

distribution. Accordingly, a realistic portrayal of FOPCO's financial condition on December 31, 2014, would reflect the intended distribution either as a reduction of cash or an increase of liabilities. After reducing FOPCO's assets or increasing its liabilities by $1.5 million, its net worth (assets minus liabilities) was negative $217,101, which means that FOPCO was insolvent.

There was no material difference in FOPCO's assets, liabilities, and financial condition between December 31, 2014 (the date of the 12/31/2014 Balance Sheet) and January 15, 2015 (the date of the transfer). The only difference is that the equity distribution to Mr. McElrath that FOPCO had promised to make had not been made on December 31, 2014, but was made on January 15, 2015.

Even if FOPCO were solvent immediately before it transferred $1.5 million to Mr. McElrath, it became insolvent as a result of that transfer. Although EE and Mr. McElrath had intended to reduce FOPCO's net worth to zero, they overshot the mark and left FOPCO with negative net worth.

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 12 of 45

### 4. Defendants' Criticisms of FOPCO's 12/31/2014 Balance Sheet

The defendants argue that FOPCO's 12/31/2014 Balance Sheet was wrong (even though FOPCO prepared it under Mr. McElrath's direction) and that FOPCO was solvent on January 15, 2015. For several reasons, the evidence does not support this contention.

> ### a. FOPCO Had No Motive to Distort Its Financial Condition When It Issued The 12/31/2014 Balance Sheet, While the Defendants Do Have Such a Motive Today.

FOPCO prepared the 12/31/2014 Balance Sheet in 2015 while Mr. McElrath was in day-to-day control of FOPCO. He caused FOPCO to file the tax returns under penalty of law. He had no personal interest in exaggerating FOPCO's financial condition on its tax returns at that time. But now that the plaintiffs have sued him to recover fraudulent transfers, he has a personal motive to make FOPCO's financial condition appear better. Therefore, the contemporaneous tax returns are more reliable than the defendants' current contentions.

> ### b. The Book Value of FOPCO's Assets was Equal to Their Fair Value.

The defendants claim that the 12/31/2014 Balance Sheet is not reliable

13

because it records FOPCO's assets at "book value" (generally meaning historical cost), and the assets' book value may not be the same as their fair value. The evidence does not support this contention.

About 94% of FOPCO's assets on December 31, 2014, were cash, bank deposits, and accounts receivable. Assets of this kind do not appreciate or depreciate, so book value and fair value are equal.

There is little information in the record about the nature of the other assets, but it is highly likely that the other assets consisted of equipment and other items typically used by construction companies. Assets of that kind do not gain value with time; to the contrary, they generally lose value with use. (This is consistent with the fact that, when FOPCO filed its bankruptcy petition in 2018, it represented that its tangible assets had only nominal value.)

Therefore, I find that the book value of FOPCO's assets was probably greater than, or at best approximately equal to, the fair value of those assets.

### c. FOPCO Had No Going Concern Value on 1/15/2015.

The defendants argue that the 12/31/2014 Balance Sheet is not reliable

U.S. Bankruptcy Court - Hawaii  #20-90014  Dkt # 288  Filed  03/06/24  Page 14 of 45

because it does not reflect the value of FOPCO as a going concern. I find that, as of January 15, 2015, FOPCO had no going concern value that was not already included in the value of its reported assets; in other words, the fair value of any unrecorded intangible asset reflecting the "going concern" value of FOPCO was zero.

In early 2015, FOPCO's business was beginning a downward spiral after a meteoric rise in revenue. In 2010, FOPCO began to receive task orders from NAVFAC and its business skyrocketed. FOPCO's gross contract revenues for that same year were about $4.2 million. Just two years later, in 2012, FOPCO's gross contract revenues had grown to almost $26.6 million, a nearly seven-fold increase. In 2013, revenues dropped slightly, to $22.5 million. But in 2014, FOPCO's revenues plummeted to $7.7 million – a reduction of roughly two-thirds in a single year. The decline continued in 2015 and 2016; revenues fell to about $5.9 million and $5.7 million respectively. In 2017, FOPCO's revenues fell again, to only $2.1 million.

FOPCO's profits followed a similar pattern. FOPCO's net income from

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 15 of 45

operations[3] peaked in 2013 at about $755,000. But by the very next year (2014), FOPCO's suffered a net **loss** from operations of $76,000. In 2015, FOPCO's operating loss increased more than nine-fold, to about $722,000. The situation improved in 2016, when FOPCO earned an operating profit of about $64,000, but this profit was small in absolute terms and represented a meager 1.1% of operating income. And the downward trend resumed in 2017, when FOPCO's operating profit was only $14,000, or 0.7% of operating revenue.

FOPCO's financial condition was so precarious that, when FOPCO's accountants prepared its financial statements for the calendar year 2015, they found it necessary to investigate FOPCO's ability to continue its business as a going concern. They "[n]oted [that] cash decreased significantly and the client has negative equity due to excessive distributions to the previous interim owner. The current owner and management have the financial resources available to restore the company's financial strength. As such, the

---

[3] I find that net income from operations more reliably indicates the existence of going concern value than does overall net income. The former reflects the profitability of the company's core business. The latter includes items, such as gains from sales of assets and investments and interest income, that are likely to be one-time events.

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed   03/06/24   Page 16 of 45

company continues to be a going concern." It is not clear whether the accountants thought that Mr. McElrath or EE was the "previous interim owner" or the "current owner." But it does not matter: the point is that the accountants thought that FOPCO could survive if someone provided additional funds, and no one ever did.

In short, I find that, as of January 15, 2014, the fair value of FOPCO's "going concern" value was zero.

### d. The Dollar Value of the EE Stock Stated In The EE Agreement Is Not Reliable Evidence That FOPCO Had Positive Net Worth on 1/15/2015.

The defendants argue that the stock exchange transaction between FOPCO and EE was an arm's length transaction that proves that FOPCO's stock was worth $10.05 million. FOPCO's stock could only have value if its assets exceeded its liabilities. Therefore, according to the defendants, FOPCO must have been solvent. The evidence does not support this contention.

An arms' length sale transaction is strong evidence of the value of the asset being sold because the buyer and seller have opposite interests: the seller wants the highest price the seller can get; while the buyer wants to pay

17

the lowest possible price. When a buyer and seller with diametrically opposed interests agree on a price, it is reasonable to find that the price reflects the fair value of the asset.

The transaction between Mr. McElrath and EE was an exchange of FOPCO's stock for shares of EE's stock. This was an arms' length transaction between two parties with opposing interests: as the seller, Mr. McElrath wanted to get as many shares of EE stock as he could in exchange for his stock in FOPCO; as the buyer, EE wanted to give as few of its shares as it needed to get the FOPCO stock. Ultimately, the parties agreed to exchange 8,000 shares of FOPCO stock for 6,700,000 shares of EE stock. This is powerful evidence that the value of the FOPCO stock was equal to the value of 6,700,000 shares in EE.

But it is not evidence of the monetary value of either company's stock, because EE did not pay, and Mr. McElrath did not receive, any money for the FOPCO stock.

The defendants point out that the parties agreed that the EE stock was worth $1.50 per share. For several reasons, I find that the value per share of

18

the EE stock to which EE and Mr. McElrath stipulated is not reliable evidence of the fair value of the FOPCO stock or of FOPCO's net worth.

First, when it came to fixing a dollar value per share of the EE stock, Mr. McElrath's interests and EE's interests were aligned. After the exchange, both Mr. McElrath and EE gained if EE's stock had a high value: Mr. McElrath owned some of EE's stock, so a higher value made him richer; and a higher value per share increased the amount of money EE could get by issuing additional shares. Because of this alignment of interests, the dollar value that the parties attributed to the EE shares is not a reliable indicator of fair value.

Second, the $1.50 per share value is implausible to the point of absurdity. If EE's stock were worth $1.50 per share, then the FOPCO stock that EE acquired from Mr. McElrath in exchange for 6.7 million shares of EE stock would have been worth $10.05 million, and the stockholders' equity recorded on FOPCO's balance sheet should have been $10.05 million. According to FOPCO's 12/31/2014 Balance Sheet, FOPCO had stockholders' equity of about $1.28 million. (As I have noted, this figure is overstated

19

because it ignores the shareholder distribution that FOPCO planned to make on January 15, 2015.) In other words, if the defendants' contention were correct, FOPCO's true stockholders' equity was more than nine times greater than its recorded stockholders' equity (which was already exaggerated). A divergence of this magnitude is simply inconceivable, especially since FOPCO was suffering operating losses at the time.

Third, read in its entirety, the EE Agreement makes clear that EE's stock had no value unless and until EE could complete an IPO. Mr. McElrath had the right to unwind the transaction, and recover his FOPCO stock for free, if EE did not complete its IPO by December 31, 2015. If the EE stock or the FOPCO stock had any value in the absence of an IPO, EE would not have agreed to give the FOPCO stock back to Mr. McElrath for free.

Therefore, the value per share that the parties attributed to the EE stock is not reliable evidence that FOPCO was solvent on January 15, 2015, or any other date.

20

### e. *Mr. McElrath's $250,000 Payment To Accelerate His Right To Unwind The EE Exchange Is Not Reliable Evidence That FOPCO Was Solvent.*

In late September or October of 2015, the CEO of EE told Mr. McElrath that the Securities and Exchange Commission ("SEC") was investigating EE and that EE would be unable to complete its IPO by December 31, 2015. Mr. McElrath became concerned that EE's problems would destroy FOPCO and he decided that he wanted to recover the stock in FOPCO.

Under the EE Agreement, if EE did not complete its IPO by December 31, 2015, he had the right to recover the FOPCO stock for free. That date was less than three months away, but he did not want to wait even that long. Accordingly, he and his professionals negotiated an agreement dated November 2, 2015, under which EE agreed to accelerate Mr. McElrath's right to recover the stock in FOPCO in return for Mr. McElrath's payment of $250,000. Mr. McElrath paid EE and regained ownership of the FOPCO stock.

The defendants argue that the November 2015 acceleration transaction was an arms' length transaction between Mr. McElrath and EE that set the

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 21 of 45

value of FOPCO's stock at $250,000 or more. Therefore, argue the defendants, FOPCO had at least that much positive equity, and FOPCO was solvent.

I do not find this interpretation of the evidence persuasive. At the time, Mr. McElrath was a shareholder of EE and the manager of EE's subsidiary, FOPCO. Because of this close relationship, EE and Mr. McElrath were not fully at arms' length. Further, both EE and Mr. McElrath were under extreme pressure from the SEC investigation: Mr. McElrath had an emotional investment in FOPCO because he had built the company over the years and did not want to see "his" company destroyed due to EE's misconduct; and EE's prospects for an IPO were ruined and it probably needed cash badly. There is no evidence that the FOPCO stock was offered for sale or that anyone other than Mr. McElrath was interested in taking the stock from EE. In other words, the acceleration transaction was not a typical sale of an asset between unrelated, normally motivated parties.

It is also significant that, even if the defendants' contentions about the value of FOPCO's stock based on the EE transactions were correct (and I find

that they are not correct), FOPCO's net worth would have tumbled from $10.05 million in January 2015 to about $250,000 in November 2015, less than a year later. If this argument about solvency were accepted, it would call into serious question the defendants' claims that FOPCO had any going concern value.

Accordingly, the acceleration transaction does not change my finding that FOPCO was insolvent.

### f. *The Fair Value Of FOPCO's Claim Against T&M Was Zero.*

The defendants contend that the assets listed in the 12/31/2014 Balance Sheet should be increased by at least $1 million to reflect FOPCO's claim against T&M Construction, Inc. ("T&M"). I find that the fair value of the T&M claim was zero at all relevant times.

Beginning in about 2011, FOPCO had a contract with the State of Hawaii Department of Agriculture to perform a project on Molokai. T&M was a subcontractor to FOPCO on the project. At some point, T&M defaulted and abandoned the project. FOPCO completed the project and tracked the costs that T&M should have borne.

23

When FOPCO filed its chapter 7 petition in 2018, it listed its claim against T&M and described its value as "TBD."

The chapter 7 trustee filed a motion for authority to abandon the claim against T&M. In his motion, the trustee stated that he had investigated the claim "with input by Debtor's representatives with some knowledge and information regarding T&M's history and current status" and had concluded that the claim was not worth litigating. No one objected to the motion and the court granted it on April 16, 2019. The trustee's abandonment meant that the claim reverted to FOPCO's control.

FOPCO sued T&M and recovered a default judgment for about $1 million in 2020. T&M has not paid the judgment, and FOPCO has made no serious attempt to collect it.

I find that the T&M claim (now reduced to judgment) is and always has been probably uncollectible and that its "fair value" is and always has been zero. If there were a realistic chance of collecting any amount on the judgment that exceeded the cost of collection, either the trustee or FOPCO would have made the attempt. Neither of them did.

24

### g. *The 12/31/2014 Balance Sheet Appropriately Recorded FOPCO's Liability to Nan.*

FOPCO's liability to Nan made up an overwhelming majority of FOPCO's total liabilities. The defense argues that the 12/31/2104 Balance Sheet is inaccurate because it overstated those liabilities. They contend that, if the 12/31/2014 Balance Sheet reflected only the undisputed amount that was due to Nan on that date, FOPCO would be solvent. The evidence does not support this contention.

First, they offer evidence that, following conservative accounting practices, FOPCO recorded as a liability the full amount that Nan claimed, even though FOPCO disputed that amount and only a smaller amount had become due and payable on that date. They apparently think that a court should not employ similarly conservative principles when assessing an entity's solvency under a fraudulent transfer analysis. But they do not explain or offer any authority for this position, probably because the position makes no sense. Fraudulent transfer law exists to protect creditors. A conservative approach to solvency is more protective of creditors. Therefore, conservate accounting is appropriate in the fraudulent transfer context.

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 25 of 45

I find that a reasonable evaluation of FOPCO's solvency must consider, not only debts that had become due and payable at the relevant date, but also those debts that were likely to become due and owing after that date. For example, imagine a debtor that, on December 31, 2023, had $100 of assets, one $50 debt that became due on December 30, and another $500 debt that will not become due until January 1, 2024. No sensible evaluation of the that debtor's net worth on December 31 would simply ignore the $500 debt because it was not yet due.

Similarly, I find that a reasonable evaluation of FOPCO's solvency must consider both disputed and undisputed debts. For example, imagine a debtor that, on December 31, 2023, had $100 of assets, one undisputed $50 debt, and another debt for $500 that the debtor disputed. No sensible evaluation of the solvency of that debtor would simply ignore the $500 debt because it was disputed.

In some cases, it might be appropriate to discount a disputed debt to reflect the odds that the debtor might win the dispute. In this case, however, I find that no such discount is warranted, because Mr. McElrath has already

26

litigated the dispute and (mostly) lost. In the main bankruptcy case, Nan filed a proof of claim in the amount of $3,525,655.00. Mr. McElrath objected to Nan's proof of claim. After a two-day evidentiary hearing, I allowed the claim in the amount of $3,142,795.85. The district court affirmed. *In re FOPCO, Inc.*, No. 18-01084, 2022 WL 174171, at *6 (Bankr. D. Haw. Jan. 18, 2022), *aff'd sub nom. McElrath v. Nan, Inc.*, No. CV 22-00047 LEK-WRP, 2023 WL 4079439 (D. Haw. June 20, 2023). Mr. McElrath's further appeal to the Ninth Circuit remains pending. My decision fixes the amount of Nan's claim as of the date of FOPCO's bankruptcy filing (September 24, 2018). That decision is the law of the case and may have issue preclusive effect on some issues in this adversary proceeding.

Even if my decision is not binding, the defendants' arguments about the amount of Nan's claim as of January 15, 2015 (and the dates of the other transactions challenged in this case) are the same as the arguments they made about the Nan Claim as of the bankruptcy date. I rejected most of their arguments when I allowed Nan's claim as of the bankruptcy date. I find that these arguments are equally invalid when evaluating Nan's claims as of the

dates of the challenged transactions.

In summary, many of the defendants' objections to Nan's claims assume that Nan was just a subcontractor to FOPCO and that the Master Subcontract is the primary agreement between them. This is incorrect. As I have noted above, the three agreements between FOPCO and Nan created (in substance) a joint venture in which Nan had the dominant role. Based on a correct understanding of the parties' contractual relationship, nearly all of FOPCO's arguments fail.

I find that, if the amount of Nan's claim as of January 15, 2015, and as of the dates of each of the challenged transfers, were litigated to conclusion, there is a very high likelihood that Nan would prevail.

### 5. FOPCO's Capitalization and Ability to Pay Debts on January 15, 2015

After FOPCO made the 1/15/2015 Transfer, its capital was unreasonably small for the business in which it was engaged. It was still carrying out task orders with Nan and had insufficient cash and other assets to pay the debts it had already incurred to Nan, let alone the additional debts and expenses it would incur as it continued to operate its business.

28

Similarly, when FOPCO made the 1/15/2015 Transfer, FOPCO knew that it had incurred debts and would continue to incur debts to Nan that FOPCO could not pay as those debts matured and came due.

**D. THE 12/4/2016 TRANSFER**

On or about December 4, 2016, FOPCO paid Mr. McElrath $300,000 on account of "additional compensation" (the "12/4/16 Transfer.")

Mr. McElrath testified that, after he retrieved FOPCO's stock from EE, he reduced his own salary to conserve FOPCO's cash. He periodically met with his financial advisors and accountants to determine whether he could receive a salary catchup payment. He caused FOPCO to make the 12/4/16 Transfer to him because he thought it was appropriate based on his prior salaries from FOPCO, the reduced salary he was taking, and the expansion of his duties.

Mr. McElrath's testimony and the circumstantial evidence supports the plaintiffs' case. Mr. McElrath caused FOPCO to make the 12/4/2016 Transfer because he wanted to take for himself as much of FOPCO's cash as he could rather than pay it to Nan. The plaintiffs proved, by clear and convincing

evidence, that FOPCO made the 12/4/2016 Transfer with the actual intent to hinder, delay, or defraud Nan, a current and future creditor.

On December 4, 2016, FOPCO continued to be insolvent, undercapitalized, and incapable of paying debts when due. In fact, its financial condition was even worse on December 4, 2016, than it was on January 15, 2015. The EE transaction had harmed FOPCO's position in two respects: first, Central Pacific Bank terminated FOPCO's line of credit, reducing FOPCO's access to cash to fund its operations; and second, FOPCO lost its ability to obtain bonds, which meant that it could not take new projects that required bonding. These problems contributed to the dramatic decline (described above) in FOPCO's gross revenue and operating income. Also, FOPCO's cash flow declined: FOPCO had barely enough cash to cover its expenses (and FOPCO was not paying Nan, its largest creditor).

FOPCO did not receive reasonably equivalent value in exchange for the 12/4/2016 Transfer. Mr. McElrath was willing to, and did, provide the work that FOPCO needed from him at the reduced salary. FOPCO did not benefit from paying Mr. McElrath more for work that he had already done.

30

In substance, the 12/4/2016 Transfer was a distribution on account of Mr. McElrath's ownership of FOPCO, and not compensation for services rendered or payment of a debt that FOPCO owed to him.

### E.  THE 12/30/2016 TRANSFERS TO 2149 AND CDI

Because FOPCO was short on cash, in November 2015, FOPCO asked 2149 to reduce its rental payment from $20,000 to $5,000 per month. It also asked CDI to reduce its rent from $10,000 to $2,500. In both cases, FOPCO proposed to pay the deferred balance (plus interest at the prime rate plus 1%) in twelve months. 2149 and CDI agreed.[4]  But FOPCO did not reduce the rent payments and instead continued paying the full contract rent.

On or about December 30, 2016, FOPCO paid $180,000 to 2149 and paid $90,000 to CDI  (the "12/30/2016 Transfers.") These amounts were equal to the rent that FOPCO had proposed to defer. But FOPCO had in fact paid those rents. Mr. McElrath testified that this double payment was a mistake by FOPCO's accounting department.

The plaintiffs did not prove that FOPCO made the 12/30/2016 Transfers

---

[4] This was hardly surprising because Mr. McElrath controlled all three entities.

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 31 of 45

with the actual intent to hinder, delay, or defraud any current or future creditor. Mr. McElrath's testimony that these transfers were the result of a mistake by FOPCO's accounting department is credible.

FOPCO continued to be insolvent on December 30, 2016, and its capitalization and ability to pay debts when due had continued to decline.

FOPCO did not receive anything in return for the 12/30/16 Transfers. It had already paid the rent that was supposedly deferred.

### F. THE 4/17/2017 TRANSFERS

On or about April 17, 2017, FOPCO paid Mr. McElrath a "bonus" of $350,000 and a "return of capital" of $500,000 (the "4/17/2017 Transfers.")

The plaintiffs proved, by clear and convincing evidence, that FOPCO made the 4/17/2017 Transfers with the actual intent to hinder, delay, or defraud Nan, a current and future creditor. The circumstantial evidence convinces me that Mr. McElrath caused FOPCO to make the transfers because he wanted to take for himself as much of FOPCO's cash as he could rather than pay it to Nan.

FOPCO continued to be insolvent on April 17, 2017, and its

32

capitalization and ability to pay debts when due had continued to deteriorate.

FOPCO did not receive anything in return for the 4/17/17 Transfers. Mr. McElrath had already provided the services for which he received a bonus. He had no contractual right to a bonus and, because FOPCO's business had continued its rapid slide under his leadership, he had not earned one. The bonus was in substance a distribution to Mr. McElrath on account of his ownership of FOPCO, not payment of a debt that FOPCO owed him. FOPCO got no benefit from either the bonus or the return of capital.

### G. THE PORSCHE TRANSFER

The complaint also alleges that FOPCO transferred title to a vehicle to Mr. McElrath. But the plaintiffs did not offer any evidence about this transfer at trial and said that they were withdrawing any claims based on this transfer.

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW

### A. JURISDICTION AND VENUE

Personal jurisdiction and venue are undisputed. The court has an independent duty to determine it has subject matter jurisdiction, even if the parties do not raise the issue.

The district court has subject matter jurisdiction of "all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]." 28 U.S.C. § 1334(b). The district court in this district has referred to the bankruptcy court all cases and proceedings that are within its subject matter jurisdiction. *Id*. § 157(a).

A proceeding "arises under" the Bankruptcy Code if the Code provides the rule of decision. *In re Sasson*, 424 F.3d 864, 868 (9th Cir. 2005). Thus, the plaintiffs' claims that are premised on §§ 548, 544(b), and 550[5] "arise under" the Code.

A proceeding is "related to" a bankruptcy case if a recovery would

---

[5] Unless otherwise indicated, all citations to sections refer to the Bankruptcy Code, Title 11 of the United States Code.

34

augment the estate (among other situations). *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995). Therefore, the plaintiffs' claims that are premised on HUFTA are "related to" the bankruptcy case.

The next question is whether the bankruptcy court may enter a final judgment.

The bankruptcy court has the power to enter final judgment in all "core proceedings arising under title 11 . . . ." *Id*. § 157(b)(1). In a proceeding that is "not a core proceeding but that is otherwise related to a case" under the Bankruptcy Code, the bankruptcy court may hear the proceeding and submit proposed findings of fact and conclusions of law to the district court, and "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected," *id*. § 157(c)(1), unless the parties consent to the entry of final judgment by the bankruptcy court.

In their answer, the defendants denied that the case is a core proceeding and did not consent to the entry of final judgment by the

35

bankruptcy court.

The statute specifies that "[p]roceedings to determine, avoid, or recover fraudulent conveyances" are a core proceeding. 28 U.S.C. § 157(b)(2).

But the analysis does not end there. The court must determine whether the claim is a so-called "*Stern*" claim. Named after Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), a claim is a *Stern* claim if the statute provides that it is core but the Constitution does not permit Congress to empower a bankruptcy judge lacking life tenure to enter a final judgment on that claim. *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34-5 (2014).

In the Ninth Circuit, fraudulent transfer claims against defendants who are creditors are not *Stern* claims but such claims against noncreditors are *Stern* claims. *See Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 565 (9th Cir. 2012). The reason for this rule is that a creditor who files a claim in the bankruptcy case submits itself to the bankruptcy court's determination of its claims. Under § 502(d), the bankruptcy court must disallow any claim filed by a person who received an avoidable transfer and has not returned the transfer previously or repaid its

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 36 of 45

value. In other words, the bankruptcy court cannot allow the creditor's claim against the estate until it has adjudicated the estate's avoidance claims against the creditor.

The claims against Mr. McElrath and 2149 are not *Stern* claims. Mr. McElrath and 2149 filed proofs of claim in the main case (*see* claim nos. 8 and 9 in the claims register for case no. 18-1084). But CDI did not file a proof of claim, and the deadline to file claims passed many years ago, so the plaintiffs' claims against CDI are *Stern* claims.

Thus, the bankruptcy court can enter a final judgment on all claims against Mr. McElrath and 2149 but may only enter proposed findings of fact and conclusions of law on all claims against CDI.

### B. THE 1/15/2015 TRANSFER

The plaintiffs have proven that FOPCO made the 1/15/2015 Transfer to Mr. McElrath with the actual intent to hinder, delay, or defraud its creditors. They are entitled to avoid the 1/15/2015 Transfer pursuant to § 544(b)(1) and HUFTA § 651C-4(a)(1).

The plaintiffs also proved that FOPCO made the 1/15/2015 Transfer to

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 37 of 45

Mr. McElrath without receiving reasonably equivalent value in exchange, and that, when it made the transfers, (1) FOPCO was insolvent or was made insolvent by the transfer, (2) FOPCO had unreasonably small capital for its current and anticipated transactions, and (3) FOPCO knew or reasonably should have known that it would incur debts that it could not pay when due. They are entitled to avoid the 1/15/2015 Transfer under § 544(b)(1) and HUFTA §§ 651C-4(a)(2) and 5(a).

## C. THE 12/4/2016 TRANSFER AND THE 4/17/2017 TRANSFER

The plaintiffs proved that FOPCO made the 12/4/2016 Transfer and the 4/17/2017 Transfer to Mr. McElrath with the actual intent to hinder, delay, or defraud Nan, a creditor to which FOPCO was indebted. The plaintiffs are entitled to avoid the 12/4/2016 Transfer and the 4/17/2017 Transfer pursuant to § 548(a)(1) and also pursuant to § 544(b)(1) and HUFTA § 651C-4(a)(1).

The plaintiffs also proved that FOPCO made the 12/4/2016 Transfer and the 4/17/2017 Transfer to Mr. McElrath without receiving reasonably equivalent value in exchange, and that (1) FOPCO was insolvent when it made the transfers or became insolvent because of the transfers, (2) FOPCO

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 38 of 45

had unreasonably small capital for its current and anticipated transactions, and (3) when it made the transfers, FOPCO knew that it would incur debts that it could not pay when due. The plaintiffs are entitled to avoid the transfers under § 548(a)(1)(B).

The plaintiffs proved that FOPCO made the 12/4/2016 Transfer and the 4/17/2017 Transfer to Mr. McElrath without receiving reasonably equivalent value in exchange, and that, when it made the transfers, (1) FOPCO was insolvent or was rendered insolvent, (2) FOPCO had unreasonably small capital for its current and anticipated transactions, and (3) FOPCO knew or reasonably should have known that it would incur debts that it could not pay when due. The plaintiffs are entitled to avoid the 12/4/2016 Transfer and the 4/17/2017 Transfer under Bankruptcy Code § 544(b)(1) and HUFTA §§ 651C-4(a)(2) and 5(a).

## D. THE 12/30/2016 TRANSFERS

The plaintiffs failed to carry their burden of proving that FOPCO made the 12/30/2016 Transfers to 2149 and CDI with the actual intent to hinder, delay, or defraud its creditors.

39

The plaintiffs proved that FOPCO made the 12/30/2016 Transfers to 2149 and CDI without receiving reasonably equivalent value in exchange, and that, when it made the transfers, (1) FOPCO was insolvent or was made insolvent by the transfers, (2) FOPCO had unreasonably small capital for its current and anticipated transactions, and (3) FOPCO knew or reasonably should have known that it would incur debts that it could not pay when due. The plaintiffs are entitled to avoid the 12/30/2016 Transfer to 2149 under Bankruptcy Code § 544(b)(1) and HUFTA § 651C-4(a)(2) and 5(a). I recommend that the district court make the same finding and conclusion against CDI.

**E. RECOVERY**

Section 550 provides (in relevant part) that, to the extent a transfer is avoided under section 544 or 548, the trustee may recover from the initial transferee, for the benefit of the estate, either the property transferred or, if the court so orders, its value.

In this case, all of the avoided transfers were cash payments. It would make no sense to require the defendants to return the specific cash that

40

FOPCO paid them. Accordingly, the plaintiffs are entitled to recover a money judgment for the amount of each transfer.

Although the plaintiffs are entitled to recover some of the transfers on multiple legal grounds, they are only entitled to a single satisfaction, i.e., a judgment in the amount of each transfer.

Mr. McElrath was the "initial transferee" of the 1/15/2015 Transfer in the amount of $1,500,000.00, the 12/4/2016 Transfer in the amount of $300,000.00, and the 4/17/2017 Transfer in the amount of $850,000.00, for a total of $2,650,000.00.

I recommend that the district court conclude that CDI was the "initial transferee" of the 12/30/2016 Transfer in the amount of $90,000.

The plaintiffs should take nothing on their claims respecting the Porsche Transfer.

**F. INTEREST**

All counts of the complaint pray that the court award "interest as the court determines."

In a case brought in federal court where state law provides the rule of

41

decision, state law governs prejudgment interest and federal law governs postjudgment interest. *Summit Creditors' Trust v. Hawaii Forest Preservation, LLC (In re Metro. Mortg. & Sec., Co., Inc.)*, No. 04-00757, 2010 WL 3842468, at *1 (Bankr. D. Haw. Sept. 27, 2010), *aff'd*, 448 B.R. 527 (D. Haw. 2011), *aff'd*, 584 F. App'x 366 (9th Cir. 2014).

The complaint asserts claims under both federal and state law. The federal and state claims are nearly identical, such that the plaintiffs could recover all of the challenged transfers under state law, and most of them under federal law. Because the plaintiffs are entitled to all of the relief they sought under their state law claims, it is appropriate to allow prejudgment interest under state law.

Under Ninth Circuit law, the court has discretion to grant prejudgment interest under state law on fraudulent transfer claims from the date each transfer was made. *See In re Slatkin*, 525 F.3d 805, 820 (9th Cir.2008); *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 541–42 (9th Cir.1990); *Field v. Kepoikai (In re Maui Indus. Loan & Fin. Co.)*, 483 B.R. 346, 353 (Bankr. D. Haw. 2012). It is appropriate to grant prejudgment interest in this

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 42 of 45

case because the defendants should not retain the time value of the money that they wrongfully took from FOPCO. "[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money." *Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir.2008).

Therefore, the plaintiffs are entitled to judgment against Mr. McElrath and 2149 in the amount of each of the transfers, plus prejudgment interest at the Hawaii state rate of ten percent per annum[6] from the date of the transfer to the date of entry of judgment, and postjudgment interest on the full amount of the judgment at the applicable federal rate from the date of entry of that judgment. I recommend that the district court draw the same conclusion as to the transfers to CDI.

---

[6] Haw. Rev. Stat. § 636–16.

# JUDGMENT

## A. DEFENDANTS DENNIS C. MCELRATH AND 2149 LAUWILIWILI LLC

The plaintiffs are entitled to judgment against defendant Dennis C. McElrath in the amount of $2,650,000 plus interest at ten percent per annum on (a) $1,500,000 from January 15, 2015, (b) $300,000 from December 4, 2016, and (c) $850,000 from April 17, 2017.

The plaintiffs are also entitled to judgment against defendant 2149 Lauwiliwili LLC in the amount of $180,000 plus interest at ten percent per annum from December 30, 2016.

Interest shall accrue at these rates until the entry of judgment. Interest shall accrue after the entry of judgment at the applicable federal rate.

Counsel for the plaintiffs shall submit a proposed judgment as to Dennis C. McElrath and 2149 Lauwiliwili LLC.

## B. DEFENDANT CD INVESTMENTS LIMITED PARTNERSHIP

I recommend that the district court enter judgment against CD Investments Limited Partnership in the amount of $90,000 plus interest at ten percent per annum from December 30, 2016.

44

The clerk shall provide the proposed findings of fact and conclusions of law to CD Investments Limited Partnership together with notice of the time to file any objections which identify the specific proposed findings or conclusions objected to and the grounds for such objection. *See* Fed. R. Bankr. P. 9033. The clerk shall transmit this recommendation to the district court following receipt of any timely objections by CDI and the plaintiffs' responses to any objections.

**END OF FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

U.S. Bankruptcy Court - Hawaii   #20-90014   Dkt # 288   Filed  03/06/24   Page 45 of 45